## BRINSON v. ARKANSAS NATURAL GAS CORPORATION et al.

### No. 4680.

Court of Appeal of Louisiana. Second Circuit.

Feb. 5, 1934.

B. F. Roberts, of Shreveport, for appellant.

Wm. C. Boone, of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff, on March 31, 1931, while in the employ of and performing labor for defendant Arkansas Natural Gas Corporation at and about one of its producing wells in the Homer oil field, experienced an accident which caused serious injury to him. He was conceded to be entitled to compensation of $20 per week, and this amount was regularly paid him, presumably by defendant's insurer, Union Indemnity Company, for 60 weeks; and, thinking plaintiff had recovered from his disability resulting from said injury, payments thereafter were discontinued. This suit was then instituted against the gas company and its insurer to recover compensation at said weekly rate for 400 weeks, less the payments, and for the maximum amount allowed by law for medical expenses, sanitarium and physicians' bills incurred by plaintiff on account of his injuries. His allegations and testimony disclose that he and another laborer had loaded some foundation timbers on a truck of defendant to be transferred to another place in the oil field; that the ground was slippery from rain, and he and said co-workman were pushing and lifting the truck to enable it to haul its load; that the fore wheels of the truck crossed a narrow ditch but the rear wheels stuck therein and the truck, of its own power, could not pull out; and that he and his assistant were straining to extricate the truck from said ditch, and, as the rear wheels were about out of it, the truck's driver, without warning, suddenly put the truck in reverse gear, backing it against their efforts to shove it forward, and it was then and there he was injured. Specifically, the injuries are alleged to be strain and wrenching of the right side of the back, hurting of pelvic bones, injuries to his lower back and spine, possibly causing arthritis of the lower lumbar spine and sacroiliac joints, with displacement of vertebræ. He avers that his disability is total and permanent, preventing him from performing work of any reasonable character.

Defendants admit that plaintiff was injured on the date alleged by him, but that he has been paid all the compensation he was entitled to; in all other respects the essential allegations of the petition are denied.

From a judgment for plaintiff for compensation sued for and $100 medical expenses, the gas company appeals. Before the case was tried, the Union Indemnity Company was placed in receivership. No judgment was rendered against it.

There is no testimony in the record as to the facts and circumstances of the accident to plaintiff but his own. It stands alone, but is uncontradicted.

After testifying about the truck's rear wheels being stuck in the ditch and spinning when the motor power was applied to them, and the efforts of himself and assistant to shove the truck out, he says further:

"Q. Did the truck driver shove the engine in the car backward? A. This shackle line was sawing the casing, looked like was going to cut a hole in it and he wanted to get off— the motor would not pull it up out of the ditch, so he just asked us to give him a real hard shove, to get it off the shackle line to keep from cutting a hole in the casing, I was standing straddle the ditch reached down under the side of the truck, and was pushing it forward, we got it up to the edge of the ditch and it stopped again, and when it stopped he just all of a sudden, without any warning threw it in reverse and it come back on me.

"Q. When he threw it in reverse you were still pushing? A. Yes sir, that is what hurt me, I was pushing ahead, so I was not expecting the truck to come back.

"Q. You were finally pushed out of the way? A. Yes sir, but it jerked me forward, jerked me down right quick all of a sudden and twisted me around."

That the reverse motion of the truck, without notice to plaintiff, who was exerting strenuous physical effort at the time to shove it forward, subjected him to unusual strain and serious injury may be safely assumed; and in addition he was twisted around and jerked to the ground a result which would be expected to follow the sudden reversal of the truck's movement.

Plaintiff had rendered faithful and satisfactory service to his employer for more than twelve years as an oil field roustabout. His duties required the performance of heavy work. He was receiving $5 per day when in-

jured, but has not been able to perform manual labor since that time. He is only qualified to earn a livelihood by such labor. In his home town of Homer he enjoyed a good reputation.

The record is replete with contradictory evidence of medical and X-ray experts. Among the experts of both sides are included some of the most prominent doctors and radiologists in the city of Shreveport, the sincerity of whose opinions we do not, and have no good reason to, question; but some of them are in error as to plaintiff's condition.

After a careful study of the testimony in the case, we arrive at the conclusion that, whatever other injuries plaintiff suffered from the accident, there remained only one that bothered him to any great extent at time of institution and trial of this suit, and that one involved the right sacroiliac joint and the muscles, ligaments, etc., of that particular part of the body. It was conceded originally that his injuries were serious and his disability total, because the maximum amount of compensation, in such a case, was paid him for 60 weeks. The question at issue now is as to whether he has recovered and is now able to do the work he formerly did. No question of partial disability is presented.

Immediately after he was injured, plaintiff's case was intrusted to Dr. E. B. Middleton, of Homer, La., who is referred to as the physician of one or both of the defendants. Dr. Middleton treated him regularly until a few weeks before the case was tried. He treated him for several weeks, perhaps months, after he was advised by defendants that they would no longer be responsible for the expense of the treatment. This doctor, from a physical examination, thought plaintiff's right sacroiliac joint was strained, but said that an X-ray picture of the joint made two weeks after the injury did not confirm his opinion, but negatived it. Plaintiff was confined to his bed for ten days or more. In answer to a direct question on the point, Dr. Middleton, as a witness for defendants, gave it as his opinion that plaintiff was not suffering from any disability as a result of the injury of March, 1931, notwithstanding he and his office assistant administered various kinds of treatment to him to within four weeks of the trial, only ceased doing so when an electric machine used in such treatment broke down, and promised to resume the electric treatment when the machine was repaired. He states, in addition, that he did not think the treatment for the last several months did any good. The question irresistibly arises at this juncture, Why the continued treatment if there were no existing injury to be relieved?

Dr. Middleton states, and it is otherwise shown from the record, that plaintiff was again X-rayed at the North Louisiana Sanitarium in Shreveport, at the instance and expense of defendants, on October 29, 1931, seven months after being injured, and that the film made then disclosed no injury to or strain of the sacroiliac joint. However, following the making of this picture, plaintiff was again sent back to Dr. Middleton for further treatment and was treated by him under instructions of the sanitarium, at defendants' expense, on the theory that he "thought he was getting benefit from the treatment, and to go ahead and let him have it." Among the other efforts made by Dr. Middleton to relieve plaintiff's pain and injury, he prescribed the wearing of a heavy belt around the body and over the injured region, which was worn to time of trial. Applications of heat and massaging the muscles of the back were part of the long treatment. Electrical treatment was resorted to lastly.

Dr. Middleton frankly stated that he believed plaintiff wanted to and was striving to get well, and that he would resume work if his condition was such that he could do so and found a job. He would not venture the opinion that plaintiff could perform hard labor, and added that to do so he would "possibly have some pain"; that he would not pass him on medical examination as being fit for such labor, in view of the subjective symptoms of pain in the back.

We have paraphrased Dr. Middleton's testimony at length because it seems to us that, having had intimate and continued contact with plaintiff from the time he was injured to the day of trial, he should know more about his condition than any other physician. His evidence throughout is not entirely consistent, but, considering it as a whole, we are of the opinion that it supports the contention that plaintiff is yet suffering from sacroiliac sprain. We cannot understand why plaintiff was requested to return for treatment and was treated up to a month of time of trial, with promise of additional treatment, if he had entirely recovered from the disabilities consequent to the accident to him eighteen months prior, and this, too, when the doctor had little or no hope that the bill for his services would be paid.

Plaintiff was required to go through different physical motions and movements under the eye of the trial judge. The subjective symptoms of which he complains are that he cannot stoop down without pain and cannot lift a weight from the ground when he does stoop; has lack of back strength to do lifting. He localizes the pain as being in the center of the back and in right side, causing nervousness and sleeplessness.

Plaintiff's version of his condition is supported by the testimony of Dr. Palmer, a general practitioner of Homer, La., and by that of Drs. Potts, Huckaby, and Cassity, of Shreveport. These last three are of the opinion, from physical examination and study of X-ray picture, that plaintiff's right sacroiliac

is strained, and that there is subluxation of the joint, which means that the bones there at times slip out of proper relation under strain or exertion of the body. Dr. Thomas, who specializes in radiology in Shreveport, made a picture of plaintiff's lumbar vertebræ and sacroiliac joint the day of trial (September 30, 1932). His picture disclosed abnormal conditions in and about the joint, with evidence of torn and detached ligaments. He also thought there was subluxation of the joint, and stated that plaintiff could not hold up at hard labor for two hours.

Dr. Barrow, X-ray specialist of a quarter of a century's experience, made a picture of the injured portions of plaintiff's body on October 29, 1931, but could find nothing out of line or abnormal about him. He examined and read from X-ray pictures of the lumbar and pelvic regions of plaintiff's body, made by Dr. J. R. Anderson, the day of trial, but could see nothing wrong or abnormal about same. Dr. Anderson gave the same interpretation of the pictures.

On the day of trial, plaintiff was subjected to a very close and exacting physical examination by Dr. Guy A. Caldwell, in the presence of several other physicians who testified for defendants. He thought plaintiff rather non-co-operative and resistant to his efforts to manipulate his joints. His opinion, on direct examination, was that there is nothing the matter with plaintiff's sacroiliac joint; that his case now is mental. He admitted that plaintiff limped in his right leg when walking, and that his complaints were directed to the region about the right sacroiliac joint. He also said that injuries and sprains of sacroiliac joints last from a few days to several years, depending upon the seriousness of the injury or strain. However, in conclusion, he testified as follows:

"Q. Doctor you are not in position to say that he has no sprain there at this time positively? A. I don't think anyone could say positively—

"Q. You don't think anyone would say absolutely that he has no sprain there? A. I didn't say would not say, but could not say absolutely, only give his opinion."

Dr. Herold was present when Dr. Caldwell examined plaintiff on day of trial. He corroborated the testimony of Dr. Caldwell, and says:

"Q. How many examined him together today? A. There was Dr. Caldwell, Dr. Heard, Dr. Smith and Dr. Middleton, five—

"Q. Five of you? A. Yes.

"Q. Five of you examined him at once? A. Yes sir.

"Q. In fact if he had said anything been no use there were you five to one? A. We would not perjure ourselves for a little case like this.

"Q. But he may have thought that though, he didn't know did he? A. He looked like he was afraid that we were trying to trip him up or something.

"Q. Now he finally told you where his pain was at, he told you? A. He said from the first where his pain was, that it was in the right side.

"Q. And then in stepping up on the box what did you say, how did he do that? A. He put the left foot first, then turned himself around, bring his right up.

"Q. Did you have him walk down the road, I mean the alleyway, see him walk? A. He walked a short distance in the room there.

"Q. Did he walk normally? A. No, he had some limp.

"Q. Did you have him try to lift anything? A. No, I didn't ask him to do that, I didn't.

"Q. You are not in position to say that he has no pain in the back are you? A. I am just giving my opinion, I satisfied myself—

"Q. Will you testify positively that he has no pain in his back? (Objected to as not a fair question.) A. I have already answered—

"Q. Are you in position to say that he has no strain in his back there? A. No, I believe Mr. Brinson's history, I believe he did have a strain originally.

"Q. Well how long, I don't know if I asked you how long did that last? A. No fixed time for that, but my experience with these cases has been, my opinion from cases I have seen in private practice the pain is not constant all the time, the patient apparently gets all right, then it recurs again, especially on straining work.

"Q. That strained condition might last for how long, how many years might it last? A. I don't know, there is no fixed time.

"Q. If a man does have pain, in bending over, stooping and lifting, would you consider that he was able to work, do manual labor in the oil field? A. If he has pain constantly I don't think he is, no.

"Q. Did you ask him whether or not he could sleep well at night? A. I think we did, I think he replied he didn't rest."

Drs. J. E. Heard and Tom Smith were also present at the above referred to examination of plaintiff and their testimony substantially corroborates that given by Drs. Caldwell and Herold. No good purpose would be served by giving details of their evidence. After all, the summation of their testimony is that in their opinion plaintiff is not now disabled to perform labor, but they frankly admit that they could not be absolutely certain on the question. They all admit that he complained of severe pain when physical manipulation of the joint was attempted. No reputable physician would venture the absolute opinion that plaintiff has not the subjective symptoms of which he complains; and all who testified in

the case agree that a severe strain of the sacroiliac joint may not become well for several years, and, further, that performance of heavy work would retard return of normal conditions thereof.

When we find irreconcilable conflict in the testimony of many prominent physicians, in conjunction with readings and interpretations of X-ray pictures of the injured area, diametrically at variance, we are forced to rely largely upon lay testimony, if there be such, and the trial judge's findings of fact based upon his superior opportunity to observe and hear the details of the trial which has been enacted before him.

Plaintiff's conduct and attitude reflect a desire on his part to be restored to good health. His wages when well were nearly twice as much as the compensation he is suing for. To hold that he is now a well man and able to return to his former line of work is to convict him of perjury of the rankest sort for gain. We are not impressed with the suggestion that he is that sort of man. If he suffers the pains and weakness that he claims to, and which are usually associated with or follow a strain of the sacroiliac joint, no one, save himself, can positively know it. Such symptoms are to be expected as an incident to such an injury.

While studying this case, we were convinced that the judge of the lower court followed the progress of trial closely. At times he interrogated the witnesses on material matters out of a desire to elicit facts pertinent to the issue in controversy. Under such circumstances his judgment should, and does, carry great weight with us.

The judgment appealed from is affirmed, with costs.